RECORD NUMBER: 15-4032, 15-4050 (Consolidated)

# United States Court of Appeals

*for the*

# Fourth Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

W. WAYNE PERRY, JR. and ANGELA PERRY,

*Appellants*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK

## BRIEF FOR APPELLANTS
## (PUBLIC)

ANDREW MICHAEL SACKS
Sacks & Sacks
150 Boush St
Suite 501
Norfolk, VA 23510-3874
Tel: (757) 623-2753

JOHN S. DAVIS
JOSEPH R. POPE
WILLIAMS MULLEN
A PROFESSIONAL CORPORATION
200 South 10th Street (23219)
P.O. Box 1320
Richmond, Virginia 23218
(804) 420-6000

*Counsel for Appellant Angela Perry*

*Counsel for Appellant W. Wayne Perry, Jr.*

CP COUNSEL PRESS • VA – (800) 275-0668

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... iv

JURISDICTIONAL STATEMENT ............................................................ 1

STATEMENT OF THE ISSUES ................................................................ 1

STATEMENT OF THE CASE ................................................................... 2

    A.    The Trial Court Proceedings ................................................ 2

    B.    Evidence of a "Kick-Back" and Embezzlement Scheme Run By CPC Employees of Which the Perrys Were Unaware. ................ 6

        1.    Vernice Spain ............................................................ 7

        2.    Serena Freeman ........................................................ 9

        3.    Other Staffing Coordinators ..................................... 10

        4.    The Billing Clerks .................................................... 11

        5.    CPC Nurses .............................................................. 13

    C.    The Government Offers Evidence to Establish a Fictitious "Live-in-the-Home" Requirement for Respite Care, Along with an Unwritten "Requirement" that the Primary Caregiver Personally Request Respite Hours ............................................. 14

STANDARDS OF REVIEW ..................................................................... 17

SUMMARY OF ARGUMENT ................................................................. 19

ARGUMENT ............................................................................................ 20

    I.    The Perrys' Convictions Should Be Vacated Because There Is a Reasonable Likelihood that Inaccurate Evidence Admitted at Trial Affected the Jury Verdict in Violation of the Perrys' Rights to Due Process ......................................................................... 20

        A.    The Perrys' Convictions Should Be Vacated Under *Napue v. Illinois* ........................................................................ 21

            1.    The evidence regarding the Medicaid requirements to obtain respite care was false and misleading ................... 24

a. There was no Medicaid live-at-home requirement during the period of the offense conduct............................................................24

b. No Medicaid regulation provides that only a primary caregiver can request respite care services .........................................................................25

2. The Government should have known of the falsity of its claims............................................................26

3. The false testimony could have affected the judgment of the jury..............................................26

B. The Perrys Convictions Should Be Vacated Because the Government Impermissibly Used the Purported Violations of a Civil Regulation to Supply a Critical Element of the Criminal Offense .......................................28

II. The Perrys Must Be Acquitted on Counts 9-13 and 15-18 Because the Government Failed to Prove They Knowingly Submitted the Specific False Claims Charged in the Indictment ............31

A. Reversal of the Convictions on Count 9 is Required Because the Government Failed to Prove an Objectively False Claim Was Submitted to Medicaid .........................................31

B. Reversal is Required on Counts 10-13 and 15-18 Because the Medicaid Laws as Applied in this Case Were Unconstitutionally Vague........................................................34

C. There Was No Evidence That The Separate Offenses Committed by CPC Employees Constituted Conspiratorial Acts Under *Pinkerton v. United States* .......................38

III. The District Court Improperly Instructed the Jury on the Definition of "Willfulness" ........................................................42

IV. This Court Should Vacate the Perrys' Convictions on Counts 15–18 Because The Aggravated Identity Theft Statute Does Not Reach the Offense Conduct Charged in This Case...........................45

1. The phrase "without lawful authority" as used in § 1028A is ambiguous and should be read narrowly to conform to § 1028A's structure and purpose .................................47

ii

2.    A conviction under § 1028A requires a showing of a real victim..................................................................................50

3.    The rule of lenity requires that the Perrys' conviction be reversed..................................................................................52

V.    The Evidence Was Insufficient as a Matter of Law to Support Angela Perry's Convictions on Counts 2–13 and 15-18.........................53

CONCLUSION .................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Ajoku v. United States,*
    134 S. Ct. 1872 (2014) ...................................................................43

*Almendarez-Torres v. United States,*
    523 U.S. 224 (1998) ......................................................................48

*Berger v. United States,*
    295 U.S. 78 (1935) ........................................................................21

*Bryan v. United States,*
    524 U.S. 184 (1998) ................................................................. 42, 43

*Deal v. United States,*
    508 U.S. 129 (1993) ..................................................................47-48

*Dow v. Virga,*
    729 F.3d 1041 (9th Cir. 2013) .......................................................17

*Elonis v. United States,*
    135 S. Ct. 2001 (2015) ..................................................................45

*Flores-Figuera v. United States,*
    No. 08-108 (U.S. Jan. 2009) ..................................................... 50, 52

*Flores-Figueroa v. United States,*
    556 U.S. 646 (2009) ................................................................. 47, 51

*Giglio v. United States,*
    405 U.S. 150 (1972) ......................................................................23

*Hamric v. Bailey,*
    386 F.2d 390 (4th Cir. 1967) ........................................................23

*Hayes v. Brown,*
    399 F.3d 972 (9th Cir. 2005) .........................................................23

*Jenkins v. Artuz,*
    294 F.3d 284 (2d Cir. 2002) .........................................................22

*Johnson v. United States,*
    ___ S. Ct. ___, 2015 WL 2473450 (June 26, 2015) ...................... 36, 38

*Jones v. Angelone,*
     94 F.3d 900 (4th Cir. 1996) ............................................................ 46-47

*King v. Burwell,*
     135 S. Ct. ____, 2015 WL 2473448 (2015) ................................... 46

*McBoyle v. United States,*
     283 U.S. 25 (1931) ........................................................................ 36

*Mooney v. Holohan,*
     294 U.S. 103 (1935) ...................................................................... 21

*Napue v. Illinois,*
     360 U.S. 264 (1959) ................................................................ *passim*

*Nye & Nissen v. United States,*
     336 U.S. 613 (1949) ...................................................................... 40

*Pinkerton v. United States,*
     328 U.S. 640 (1946) ...................................................................... 41

*Ratzlaf v. United States,*
     510 U.S. 135 (1994) ................................................................. 42, 44

*Robinson v. Shell Oil Co.,*
     519 U.S. 337 (1997) ...................................................................... 47

*Rosemond v. United States,*
     134 S. Ct. 1240 (2014) .................................................................. 40

*Russell v. United States,*
     134 S. Ct. 1872 (2014) .................................................................. 43

*Shih Wei Su v. Filion,*
     335 F.3d 119 (2d Cir. 2003) ......................................................... 18

*Snyder v. Phelps,*
     580 F.3d 206 (4th Cir. 2009) ....................................................... 47

*United States ex rel. Drakeford v. Tuomey,*
     ____ F.3d ____ (4th Cir. July 2, 2015) ....................................... 32

*United States v. Abdelshafi,*
     592 F.3d 602 (4th Cir. 2010) .................................................. 46, 47

*United States v. Agurs,*
     427 U.S. 97 (1976) .............................................................. 23, 27, 28

*United States v. Ajoku,*
  718 F.3d 882 (9th Cir. 2013) ................................................... 42, 43

*United States v. Aseracare, Inc.,*
  No. 2:12-cv-245, Dkt. 298 (N.D. Ala. May 20, 2015) ........................... 41

*United States v. Barker,*
  967 F.2d 1275 (9th Cir. 1991) ................................................ 32, 33, 34

*United States v. Bartko,*
  728 F.3d 327 (4th Cir. 2013) ................................................ 22, 23, 26

*United States v. Bass,*
  404 U.S. 336 (1971) ............................................................... 53

*United States v. Burgos,*
  94 F.3d 849 (4th Cir. 1996) ....................................................... 18

*United States v. Catone,*
  769 F.3d 866 (4th Cir. 2014) ...................................................... 35

*United States v. Cedelle,*
  89 F.3d 181 (4th Cir. 1996) ....................................................... 45

*United States v. Christo,*
  614 F.2d 486 (5th Cir. 1980) ...................................................... 29

*United States v. Critzer,*
  498 F.2d 1160 (4th Cir. 1974) ..................................................... 36

*United States v. Eriksen,*
  639 F.3d 1138 (9th Cir. 2011) ..................................................... 28

*United States v. Franklin–El,*
  555 F.3d 1115 (10th Cir. 2009) .................................................... 42

*United States v. Freeman,*
  650 F.3d 673 (7th Cir. 2011) ...................................................... 22

*United States v. Hayes,*
  574 F.3d 460 (8th Cir. 2009) ...................................................... 40

*United States v. Hickman,*
  331 F.3d 439 (5th Cir. 2003) ...................................................... 43

*United States v. Hilliard,*
  31 F.3d 1509 (10th Cir. 1994) ..................................................... 30

vi

*United States v. Idowu,*
    443 F. App'x 885 (4th Cir. 2011)...............................................................18

*United States v. Iwuala,*
    ___ F.3d ___, 2015 WL 3609721 (1st Cir. 2015) ...............................42

*United States v. Kelly,*
    35 F.3d 929 (4th Cir. 1994) ....................................................................22

*United States v. Mallas,*
    762 F.2d 361 (4th Cir. 1985) ........................................................... 36, 38

*United States v. Marcus,*
    560 U.S. 258 (2010) ................................................................................18

*United States v. McLamb,*
    985 F.2d 1284 (4th Cir. 1993) ................................................................45

*United States v. Miller,*
    734 F.3d 530 (6th Cir. 2013) ................................................ 46, 47, 48, 49

*United States v. Mitchell,*
    518 F.3d 230 (4th Cir. 2008) ..................................................................19

*United States v. Mouzone,*
    687 F.3d 207 (4th Cir. 2012) ..................................................................18

*United States v. Olano,*
    507 U.S. 725 (1993) ................................................................................17

*United States v. Parker*
    ___ F.3d ___, 2015 WL 3895452, at *8 (4th Cir. June 25, 2015). .......28

*United States v. Polowichak,*
    783 F.2d 410 (4th Cir. 1986) ..................................................................45

*United States v. Price,*
    357 F. Supp. 2d 63 (D.D.C. 2004) .........................................................22

*United States v. Race,*
    632 F.2d 1114 (4th Cir. 1980) ................................................................32

*United States v. Robinson,*
    627 F.3d 941 (4th Cir. 2010) ..................................................................17

*United States v. Rufai,*
    732 F.3d 1175 (10th Cir. 2013)...............................................................39

*United States v. Russell,*
    728 F.3d 23 (1st Cir. 2013) ................................................................. 42, 43

*United States v. Santos,*
    553 U.S. 507 (2008) ...................................................................... 52-53

*United States v. Shetty,*
    76 F. App'x 842 (9th Cir. 2003) ......................................................28

*United States v. Spears,*
    729 F.3d 753 (7th Cir. 2013) ...........................................46, 47, 51

*United States v. White,*
    771 F.3d 225 (4th Cir. 2014) ...........................................................18

*United States v. Wolf,*
    820 F.2d 1499 (9th Cir. 1987) .......................................................30

*Yates v. United States,*
    135 S. Ct. 1074 (2015) ................................................................ 46, 48

**Statutes & Other Authorities:**

18 U.S.C. § 1028A .................................................................................*passim*

18 U.S.C. § 1028A(1) ..........................................................................50

18 U.S.C. § 1035 ..................................................................................*passim*

18 U.S.C. § 1347 ......................................................................3, 20, 43

18 U.S.C. § 1347(a) ....................................................................... 42, 46

18 U.S.C. § 1349 ........................................................................................2

18 U.S.C. § 1519 ........................................................................................3

18 U.S.C. § 3231 ........................................................................................1

28 U.S.C. § 1291 ........................................................................................1

Fed. R. Crim. P. 30 ...............................................................................18

Fed. R. Crim. P. 52(b) ........................................................................17

12 Va. Admin. Code 30-120-700 ................................................ 24, 25

12 Va. Admin. Code 30-120-766 ...........................................24, 25, 26

12 Va. Admin. Code 30-120-766(B)(2) ..........................................................25

12 Va. Admin. Code 30-120-768(B) .............................................................24

17 Va. Regs. Reg. p. 2599 ..............................................................................24

17 Va. Regs. Reg. p. 2613 ..............................................................................24

23 Va. Regs. Reg. p. 3174 ..............................................................................25

23 Va. Regs. Reg. p. 3181 ..............................................................................25

23 Va. Regs. Reg. p. 3201 ..............................................................................25

## JURISDICTIONAL STATEMENT

The district court possessed jurisdiction over this criminal case against Wayne and Angela Perry under 18 U.S.C. § 3231. This is an appeal from a final judgment of conviction entered on January 8, 2015. (JA 19.) The Perrys timely noticed this appeal, (JA 38.), giving this Court jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

**1.**    Whether this Court should vacate the Perrys' convictions on counts 1–5 and 9–12 because the Government (1) offered false testimony and argument that until mid-2011 applicable Medicaid regulations required that a Medicaid recipient could receive respite care only where the primary care giver lived in the recipient's home, and (2) treated as fraud all respite care hours that were not personally requested by the primary caregiver, though no Medicaid regulation contained such a requirement.

**2.**    Whether this Court should reverse the Perrys' convictions on Count 9 (personal care) because the Government failed to prove that the claim submitted was objectively false, and on Counts 10–13 and 15–18 (respite care) because the respite care services in question either (1) were actually provided to patients and the Medicaid regulations as applied were unconstitutionally vague, or (2) were fabricated and billed by CPC employees who admitted that they embezzled from Medicaid and the company without the Perrys' knowledge or involvement.

1

**3.**    Whether this Court should vacate the Perrys' convictions on counts 2–13 because the district court gave the jury an erroneous instruction on the definition of "willfully."

**4.**    Whether this Court should vacate the Perrys' convictions on counts 15–18, charging Aggravated Identify Theft, because the Government failed to prove that the Perrys "use[d], without lawful authority, a means of identification of another person."

**5.**    Whether the Government adduced sufficient evidence to establish that Angela Perry was guilty of counts 2–13 and 15–18 where the evidence failed to show a connection between her and any fraudulent claims.

## STATEMENT OF THE CASE

### A.    The Trial Court Proceedings

The Government filed an eighteen-count superseding indictment against Angela and Wayne Perry, along with Allison Hunter-Evans, on February 5, 2014 (the "Indictment"), charging them with health care offenses, aggravated identity theft, and conspiracy, related to the operation of Community Personal Care, Inc. ("CPC"), a Norfolk-based company that provided personal care and respite services to patients in their homes.

Count 1 of the Indictment charged that from January 2009 to January 2013, the Perrys conspired to defraud the Virginia Medical Assistance Program ("VMAP"), in violation of 18 U.S.C. § 1349. (JA 49.) Counts 2–5 charged that the Perrys committed

2

Health Care Fraud, in violation of 18 U.S.C. § 1347. (JA 55.) Counts 6–13 charged the Perrys with making False Statements Relating to Health Care Matters, in violation of 18 U.S.C. § 1035. (JA 57.) Count 14 charged the Perrys and Hunter-Evans with Alteration of Records, in violation of 18 U.S.C. § 1519. (JA 58.) And Counts 15–18 charged the Perrys with Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A. (JA 59–62.) Hunter-Evans pleaded guilty to Count 14 (Alteration of Records), and testified for the government at trial. (JA 1150–1265.)

The Perrys proceeded to trial, which began on August 27, 2014, and ended on September 16, 2014, with guilty verdicts against both defendants on all counts. (JA 17.) The Government called thirty-two witnesses, and the evidence showed that billing fraud occurred at CPC. But the most obvious fraud was perpetrated by embezzling staffing coordinators (who were immunized *en masse* and admitted their perfidy) and nursing aides. The proof against Mr. Perry, by contrast, was remarkably thin. The Government offered evidence to show that Mr. Perry instructed billing clerks to bill Medicaid by the patient's plan of care rather than from the actual time sheets, although he also took multiple steps to ensure that deviations from the plan of care were recorded and communicated to the billing clerk. The Government also showed that Mr. Perry instructed employees to "run the respite" or "burn the respite," (JA 201), but the employees understood this directive to mean that patients should be contacted and encouraged to use their remaining respite hours. No witness

3

testified that Mr. Perry directed her to falsify respite time sheets or submit claims for respite hours not worked.

While the evidence against Wayne was thin, the evidence against Angela Perry (who had nothing to do with billing Medicaid) was threadbare. There was evidence that Mrs. Perry once told a billing clerk that "Wayne needs 40,000 more dollars," and supposedly several employees thereafter decided amongst themselves to submit false respite forms to obtain $40,000 in payments. (JA 202, 213, 233.) There was also testimony that when a billing clerk expressed concern about CPC's practice of billing according to the plan of care rather than the aide records, Mrs. Perry said, "[T]hat is what Wayne wants to do, so that's what we do." (JA 195.) But no employee testified that Mrs. Perry told her to falsify Medicaid claims.

Additionally, a significant part of the Government's case against the Perrys was false, misleading, and unduly prejudicial. As proof that CPC fraudulently billed Medicaid for respite care hours, the Government offered testimony that under Medicaid regulations enacted prior to July 1, 2011, to be eligible for respite care services the primary caregiver was required to live with the patient. (*See* JA 125.) But this representation of the Medicaid regulations was inaccurate, since a live-in-the-home requirement was deleted from the Medicaid regulations on July 11, 2007, well before the beginning of the period charged in the indictment. Thus, for the entire duration of the charged conduct, Medicaid regulations did *not* require the primary caregiver to live in the patient's home.

4

Likewise, the Government continually emphasized that the primary caregiver, not the patient, was required to request respite care, and that respite care furnished at the patient's request amounted to health care fraud. (*See* JA 124–25.) But the Medicaid regulations contained no such requirement.

After the verdicts, on September 30, 2014, Mr. Perry moved for a new trial and judgment of acquittal, and Mrs. Perry moved for a judgment of acquittal. (JA 17.) On December 19, 2014, the district court denied the motions. (JA 18.)

Prior to sentencing, the Government urged that Mr. Perry—who had no prior criminal record and a proud record of service to his community—should receive a sentence of between 21 and 26 years' imprisonment. The district court rebuked the Government, (JA 3131), and sentenced Mr. Perry to 63 months—39 months' imprisonment on Counts 1–14, and 24 months' mandatory imprisonment on Counts 15–18, to run consecutively as required by statute. (JA 19.) The district court likewise rejected the Government's argument that Mrs. Perry should spend 168 to 210 months in prison and imposed a sentence of 25 months' imprisonment—1 month on Counts 1–14, and 24 months to run consecutively on Counts 15–18. (JA 19.) The district court also ordered forfeiture of more than $1.4 million, restitution of more than $1.4 million, and 3 years' supervised release. (JA 19.)

**B.    Evidence of a "Kick-Back" and Embezzlement Scheme Run By CPC Employees of Which the Perrys Were Unaware.**

The Government's trial evidence showed conclusively that several of CPC's staffing coordinators—led by Vernice Spain and Serena Freeman—secretly embezzled large sums from the company and Medicaid by fabricating respite care time sheets for work never done, submitting the false hours to Medicaid via the billing clerk, and pocketing the proceeds. Spain, Freeman, and others enlisted personal care aides to receive the embezzled funds and pay kickbacks to them in cash. The staffing coordinators also received "bonus checks" from CPC employees for hours not worked. They ensured that the false respite time sheets were kept separate and not in the patient charts where they would have been discovered by CPC's nurses. The staffing coordinators readily admitted that the Perrys never ordered the embezzlements; instead, they were hidden from them. When Mr. Perry discovered the embezzlements and fired Spain, Freeman and another staffing coordinator, the three women made no response. (JA 1768, 1964.) For its part, the Government studiously ignored the employee embezzlements, immunized the witnesses *en masse*, and blamed everything on the Perrys.[1]

---

[1] The FBI case agent testified that she never tried to quantify the blatant thefts of Freeman and Spain because she was "not investigating theft by employee or embezzlement." (JA 1477.) "I don't investigate embezzlements," she explained. (JA 1487.)

### 1. Vernice Spain

According to staffing coordinator Vernice Spain, who received a grant of immunity from the government, Mr. Perry would instruct CPC employees to "burn up" the respite hours. (JA 544.) But he did not say to falsify records. (JA 587.) "He just said burn it up." (JA 587.) Spain admitted that "falsifying aide records and billing for time that wasn't worked and getting paid for time that wasn't worked" was a scheme devised by. her, Freeman, and other staffing coordinators. (JA 588.) Spain admitted that the Perrys were not aware of the money she received from submitting falsified time records. She also admitted that she concealed her embezzlements from the Perrys because she "knew it wouldn't fly." (JA 600.)

Spain said that beginning in late 2011 "we made up time sheets ourselves to use respite on our own to get monies from respite. And we also had an agreement with certain aides that . . . if they did respite then we can get paid off of them." (JA 545.) Spain would give the fabricated respite time sheets to billing clerk Artincy Hobbs, so that she could bill the time to Medicaid. (JA 546.) She named several aides with whom she created false respite time sheets. (JA 546.) The aides split the money with Spain, paying kickbacks of $200 or $400 per pay period. (JA 547, 548, 601, 682.) Spain admitted that she and other staffing coordinators "knew what we did was wrong and we did increase the respite hours on our own." (JA 578, 584.) She admitted that Mr. Perry "didn't authorize us to do that. To get paid," and that "we took it upon ourselves to create [respite] time sheets on our own." (JA 626, 656.)

Spain testified that she and Freeman privately spoke to the aides and said, "[I]f you can get me my respite hours up, then . . . I'll give you a cut." (JA 606–07.) Spain would say, "[Y]ou get your patient to sign your respite time sheet, we can help you get your hours up." (JA 608, 1869.) Spain was secretive about receiving kickbacks; she once picked up a payment at a McDonald's. (JA 610.)

Spain also admitted that false time sheets for respite hours were not placed in patient files, but were held "on the side" by Hobbs, to be signed later. (JA 604.) Hobbs "had a folder that she would keep them in," but "we never did get them signed," and instead "just took them and hid them" in cabinets. (JA 604-05.) Spain knew that if these sheets were placed in the patient charts and Mr. Perry found them, "he would be fussing." (JA 605, 663.) The nurses never saw the bogus time sheets either, because they were not in the chart. (JA 605.) FBI agents seized some of these unfiled and fabricated respite time sheets when they executed a search warrant on November 29, 2012. (JA 604.)

Spain more than doubled her salary by embezzling money from Medicaid and the business, and reported earnings of more than $80,000 in 2012. (JA 578, 611.) She also received "bonus" checks for fictitious hours, in addition to her regular paychecks. (JA 623, 629.) In a single two-week pay period in 2012, for example, she was paid for working 857 hours. (JA 615, 619–20, 624, 627.) Spain acknowledged that she forged the name of a personal care aide on a payroll check for hours that she never worked.

And she admitted to embezzling money paid to CPC by prospective aides who attended classes that she taught. (JA 635, 641–42, 1668–69.)

### 2. Serena Freeman

Also testifying under immunity, Freeman said that Mr. Perry would say to "run" respite care, meaning use up the hours. (JA 688.) She claimed that once Mr. Perry established a quota for her of 1200 respite hours per week. (JA 689.) She was also directed to call patients with respite hours remaining to tell them the number of hours they had left. (JA 712.)

Freeman admitted that she filled out time sheets with false respite hours and gave them to Hobbs for billing. (JA 692.) She also encouraged aides to fabricate respite hours and took kickbacks from them. (JA 692–93, 725.) "We just split it," she said. (JA 727.) Although she claimed she could not remember the precise number, Freeman said had such an arrangement with "seven or eight people." (JA 725.)

Freeman received inflated paychecks from CPC in 2012, including one for nearly 900 hours in a single two-week pay period. (JA 745, 786.) Freeman also admitted that she and Spain concealed fabricated respite time sheets from the nurses to hide their fraud. (JA 734, 783.)

Freeman explained that she did this because "that's burning the respite. That's getting the respite, his numbers up like he wanted it." (JA 692.) Freeman testified that Mr. Perry never told her to record hours not worked. (JA 712, 740, 2349–50.) But she claimed everybody knew that when Mr. Perry said "burn it" he meant for them to

9

submit false time sheets. (JA 716.) Freeman also maintained that she "didn't steal any money." (JA 708, 720.) "I was just getting it like he was," she said. (JA 721.)

### 3.    Other Staffing Coordinators

Tamika Nichols also fabricated respite time sheets. (JA 812.) She admitted that Mr. Perry never spoke to her about respite hours and never told her to submit falsified time sheets. (JA 814.) But she said that Freeman told her once that Mr. Perry wanted them to "run respite. Whatever that meant." (JA 813, 822.) For her participation in the scheme, Nichols received checks from CPC of between $1000 and $3000 per pay period. (JA 815.)

Nichols said that when the FBI executed the search warrant in November 2012, she held fabricated respite care time sheets dated May and June 2012 in her workbag at home. (JA 806–07.) She testified that Hobbs told her not to put the time sheets in the patient files because the nurses would notice, and that they needed to hold on to the fabricated time sheets until "it all blew over." (JA 819–20.) Nichols said that Spain made up time sheets for multiple patients that had left over respite hours and provided them to Hobbs for billing. (JA 813.)

Another staffing coordinator, Renee Everson, testified that Mr. Perry would give instructions to "run his respite," which meant to tell the personal care aides that they needed to work respite hours. (JA 998.) She testified that Mr. Perry was not instructing his employees to falsify respite hours, only to encourage the aides to work them. (JA 1009–10.)

10

According to Renita Jones, Mr. Perry instructed the staffing coordinators to call the patients to get them to use respite, and to use as many respite hours as possible. (JA 1288.) She said at times the employees were directed to call patients to let them know how many respite hours they had, and to find out whether they wanted to use them. (JA 1312.) Jones received kickbacks from personal care aides who were paid for respite hours they did not work. (JA 1300, 1306.) Jones learned how to run the kickback scheme from Freeman. (JA 1308.)

According to staffing coordinator Shameka Copeland, at staff meetings Mr. Perry would instruct the staff to "run the respite." (JA 1698.) But Mr. Perry never directed employees to falsify documents or fabricate respite hours. (JA 1703, 1717.)

### 4.     The Billing Clerks

Billing clerk Azuradee Lindsey, another immunized witness, testified that around the middle of the year Mr. Perry would tell the employees to "run the respite," "which meant that we were to find patients who either had a lot of respite left or who were not using much respite and had not used any for the year, and to try to get them to use up those hours." (JA 201.) Lindsey stated that the Perrys never directed her to bill for respite hours not worked, and that Mr. Perry never directed employees to create false aide records. (JA 214, 216, 222.) She also stated that Mr. Perry gave her instructions on how much money to retract from Medicaid. (JA 215.)

Lindsey also testified that she fabricated respite time sheets. (JA 201.) Once, in 2009, Mrs. Perry came to her and the staffing coordinators and said, "Wayne needs

11

40,000 more dollars," and Lindsey and other staffing coordinators submitted false respite sheets that week. (JA 202, 213, 233.) [2]

Lindsey also said that she put false respite hours on her own time sheets, and received kickback payments from personal care aides for whom she submitted false hours. (JA 224.) Lindsey explained, "[W]e were finding aides that could carry hours on their time sheets, and as a result of them carrying hours on their time sheets, they would give us a portion of the extra hours they were getting paid for." (JA 203–04, 2311.) The kickbacks were paid in cash, and typically "on payday you would meet the aide somewhere and they would give you the money." (JA 232.) The meetings always occurred somewhere other than CPC. (JA 232.) Lindsey admitted that she never told Mr. Perry that she was submitting respite hours that she did not work. (JA 224.)

Another immunized billing clerk, Hobbs, testified that Mr. Perry told staffing coordinators to "run the respite." (JA 266.) She said Mr. Perry would encourage the staffing coordinators to contact patients to tell them whether they were eligible for additional respite hours. (JA 287.)

Hobbs billed respite care from the time sheets. (JA 267.) She testified that she knew some respite care time sheets were fabricated because there were no signatures or notes. (JA 268, 294–95.) She said she billed these sheets because Mr. Perry told her to "bill whatever was given to [her] by the staffing coordinators." (JA 268.) Hobbs

---

[2] The Government offered no corroborating evidence that such a $40,000 bolus in CPC's weekly Medicaid billings actually occurred.

said she "didn't know anything about the accuracy" of the respite time sheets, explaining she "billed what was given to me." (JA 287).

Hobbs confirmed that Mr. Perry encouraged staffing coordinators to contact patients to notify them about unused respite hours. (JA 287.) She never heard Mr. Perry instruct employees to fabricate respite hours not worked. (JA 287.) She testified that she was unaware that Mr. Perry was involved in inflating hours or lying to Medicaid. (JA 303.) And she added that approximately ten CPC employees had been fired for fraudulently recording hours, some of whom she fired herself. (JA 302.)

At the time of the November 2012 search warrant, Hobbs had a stack of unfiled respite time sheets out of view of the nurses. (JA 292.) She testified that she kept those time sheets aside because they lacked signatures, and she was supposedly planning to show them to Mrs. Perry. (JA 292, 313.)

### 5. CPC Nurses

According to CPC Nurse Linda Hanson, Mr. Perry did not instruct his employees to fabricate records and commit fraud. (JA 369.) Another CPC nurse, Deedra Davis-Hussein, said that Mr. Perry directed CPC employees to "[r]emind the primary caregiver they have respite hours." (JA 1759.) He never told her to make up hours or do anything dishonest. (JA 1760.)

13

**C.    The Government offers evidence to establish a fictitious "live-in-the-home" requirement for respite care, along with an unwritten "requirement" that the primary caregiver personally request respite hours.**

Central to the Government's charge that the Perrys fraudulently billed respite care hours was evidence that, prior to July 1, 2011, the Perrys violated Medicaid regulations by (1) providing respite care hours for patients whose primary caregivers did not live with the patient and (2) furnishing respite care hours that were requested by the patient, not the primary caregiver.

Generally, a registered nurse must supervise the personal care program that Medicaid administers. (JA 138.) The RN visits the patient, completes the initial assessment, creates the plan of care, and determines a schedule for supervisory visits, usually every 30, 60, or 90 days. (JA 139.) The supervising RN also must maintain records regarding the personal care provided to the patient. (JA 139–40.) For respite care, the supervising RN makes a recommendation that Medicaid must approve in advance. (JA 142.) The maximum number of respite care hours in a year was 720 until July 1, 2011, when the amount was decreased to 480 hours per year. (JA 145.)

Hanson described the Medicaid requirements for the respite benefit as "looser" than for personal care. (JA 346.) She said that the caregiver "can pretty much use it how they want," sometimes just to ensure that the patient was not left alone for too long. (JA 346.) Hanson testified that patients could call to schedule respite hours. (JA 368.)

14

Nevertheless, the Government endeavored to prove that every respite hour billed to Medicaid was a fraud offense, unless the primary caregiver both lived in the patient's home and personally requested the care. In its opening statement, the Government asserted, "before July 1st, 2011, a primary caregiver was required to live in the same residence as the patient. After July 1st, 2011, living in the same residence was not required, but the person still had to be a primary caregiver." (JA 78.) The Government continued: "And here's the real key: The only person who can request respite care from a Medicaid provider like Community Personal Care is the primary caregiver. *Not the patient.* And certainly not Community Personal Care. Only the primary caregiver, since he or she is the one seeking the respite, the break." (JA 78–79.)

To prove its "strict liability" theory, the Government called Christine Elliott, a registered nurse who worked for the Virginia Department of Medical Assistance Services ("DMAS"). Elliott testified that prior to July 1, 2011, every Medicaid patient was eligible for 720 hours of respite care services each year, but it was the primary caregiver, not the patient, who had to request respite services. (JA 122, 124.) She added that prior to July 1, 2011, Medicaid "required that the primary caregiver live in the same residence as the patient." (JA 125.)

Later, the lead FBI case agent, Kimberly Wright, testified that "Medicaid regulations" stated that EJ (one of the patients) and her caregiver were not eligible for respite care. (JA 1447.) Thus, according to the Government, every penny Medicaid

15

paid for respite care for EJ was fraudulent. (JA 1447.) Wright assured the jury, "It doesn't matter if [the time] was worked." (JA 1448.) According to Wright, it was "Medicaid's decision" that "if there's not a caregiver that has ever requested respite, the hours billed are fraud." (JA 1450.)

With respect to patient EM, Wright testified that the primary caregiver did not live in the home. For that reason alone, *every* hour CPC billed Medicaid for respite services for EM over the span of four years was fraudulent. The alleged overpayment totaled $35,454.61—the largest single dollar amount in the Indictment. (JA 1454.)

Examining Hanson, the Government asked about patient EJ's primary caregiver, her daughter Wanda McNair. (JA 395.) The Government inquired whether "the Medicaid regulations governing that time period required the primary caregiver to live in the home with the patient?" (JA 395–96.) Hanson said that she believed that the rule had changed before the time in question. (JA 396.) The Government then showed Hanson a 2006 version of the Medicaid manual and asked whether, if the 2006 Manual was still in effect when Hanson visited EJ in 2010, it would have been "inappropriate for Ms. McNair to receive respite care services if she did not live with Ms. Johnson." (JA 397.) Hanson agreed that it would have been inappropriate, if "that was still the rule." (JA 397.) In its redirect of McNair, the Government asked just one question: "Ms. McNair, did you live with your mother in 2010?" (JA 842.)

Finally, CPC nurse Deedra Davis-Hussein stated that in assessing a new patient, she would advise her that the primary caregiver was entitled to respite hours

16

and would encourage their use. (JA 1734, 1738.) Hussein said that a client who did not have anyone living with her could still have a primary caregiver, and that she would not open a case unless the client had a primary caregiver. (JA 1735–36.) The Government objected, to "clarify the time frame," because "the definition changed." (JA 1735.)

**STANDARDS OF REVIEW**

1.      Claims that the Government presented false and misleading testimony at trial is a legal matter reviewed *de novo. Dow v. Virga*, 729 F.3d 1041, 1049 (9th Cir. 2013). Because the Perrys challenged the Government's introduction of inaccurate and misleading evidence for the first time in their post-trial motions, the issue is reviewed for plain error. *United States v. Robinson*, 627 F.3d 941, 953 (4th Cir. 2010). The plain error rule requires an appellant to establish that the district court erred, that the error was plain, and that it "affect[ed] [his] substantial rights." *United States v. Olano*, 507 U.S. 725, 734 (1993) (quoting Fed. R. Crim. P. 52(b)). If the appellant satisfies the plain error standard, the error should be corrected where declining to do so would result in a "miscarriage of justice," *Olano*, 507 U.S. at 736 (quotation omitted), or would otherwise "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings," *id.* at 736 (quotation omitted). Still, convictions based on inaccurate and misleading evidence must be reversed absent a showing that there was no "reasonable likelihood that the false testimony could have affected the

17

judgment of the jury." *Shih Wei Su v. Filion*, 335 F.3d 119, 129 (2d Cir. 2003) (quotation marks and citation omitted).

**2.**     This Court reviews *de novo* the district court's denial of a motion for judgment of acquittal. *United States v. White*, 771 F.3d 225, 230 (4th Cir. 2014). In considering whether the evidence was insufficient to support a defendant's convictions, the Court will uphold the jury's verdict if, viewing the evidence in the light most favorable to the Government, there is substantial evidence to support the conviction. *Id.* "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996).[3]

**3.**     Whether a jury instruction correctly states the law is a question of law that is reviewed *de novo. United States v. Mouzone*, 687 F.3d 207, 217 (4th Cir. 2012). Defendants did not object to the Court's instruction on the term "willfully" as required by Federal Rule of Criminal Procedure 30. *See United States v. Idowu*, 443 F. App'x 885, 887 (4th Cir. 2011). Still, the district court's failure to instruct the jury that "willfully" means a defendant must know that his conduct is unlawful amounted to plain error. The error was obvious, it affected the Perrys' substantial rights, and the error seriously affected the fairness and integrity of the proceedings. *See United States v. Marcus,* 560 U.S. 258, 262 (2010).

---

[3] The sufficiency of the evidence standard applies also to Mrs. Perry's standalone sufficiency of the evidence claim. *See infra* Part V.

18

4.      Questions of statutory construction are issues of law subject to *de novo* review. *United States v. Mitchell*, 518 F.3d 230, 233 (4th Cir. 2008).

## SUMMARY OF ARGUMENT

1.      The Government's repeated representations to the jury, through its Medicaid witness, an FBI special agent, and its own statements to the jury that Medicaid regulations required the primary caregiver to live at home and personally make the request for respite care were false and misleading. Since July 2007, Medicaid regulations did not require the primary caregiver to live with the patient as a precondition for the patient to receive respite care. Moreover, there is no statute or regulation that mandates only primary caregivers may request respite care services. The Government's erroneous strict liability theory of criminal culpability permitted the jury to convict the Perrys based merely on the Government's erroneous construction of Medicaid regulations.

2.      The Perrys should be acquitted on Counts 9–13 and 15–18 because (1) the Government failed to adduce substantial evidence to establish that the claim forming the basis of Count 9 was actually false; (2) as applied here, the Virginia regulations and administrative practices within the Medicaid system are far too vague to form the predicate for a specific intent crime; and (3) there was insufficient evidence linking the Perrys to the fraudulent billing practices of CPC's self-dealing employees.

19

**3.** The district court erred by failing to instruct the jury that a defendant "willfully" commits an offense under 18 U.S.C. §§ 1035 and 1347 where the defendant acts with knowledge that his conduct is unlawful.

**4.** This Court has previously held that a defendant commits the crime of aggravated identity theft where he submits fraudulent bills to Medicaid even though the defendant obtained the patient's identifying information lawfully and the bills submitted to Medicaid accurately reflected the identity of the patient who purportedly received the care. However, this Court should revisit that ruling in light of recent decisions from sister circuits and the United States Supreme Court.

**5.** Additionally, this Court should reverse Angela Perry's convictions on Counts 2–13 and 15–18 because the Government introduced no evidence specifically connecting her to the offense conduct charged in those counts.

## ARGUMENT

**I.    The Perrys' Convictions Should Be Vacated Because There Is a Reasonable Likelihood that Inaccurate Evidence Admitted at Trial Affected the Verdict in Violation of the Perrys' Rights to Due Process.**

Serious errors in proof cast substantial doubt on the fundamental fairness and integrity of the Perrys' convictions on Counts 1, 2–5, and 10–13. These errors stem from the Government's repeated false and misleading representations to the jury through its Medicaid witness (Elliott), the FBI case agent (Wright), and the prosecution's statements regarding certain preconditions prescribed by law for a

20

patient to obtain respite care services. Specifically, the Government asserted that during the time of the offense conduct a Medicaid patient could receive respite care where (1) the primary caregiver *lived at home with the patient* and (2) the primary caregiver directly requested the respite services. Both claims prove false because after July 2007—the entire period of the offense conduct—Medicaid did not require the primary caregiver to live with the patient, and there exists no Medicaid regulation mandating that only primary caregivers can request respite care services. Hence, the Perrys were convicted based in large measure on their failure to satisfy conditions never imposed by law. To cure this grave injustice, this Court should vacate the Perrys' convictions on Counts 1, 2–5, and 10–13 and, at least, order a new trial.

### A.    The Perrys' Convictions Should Be Vacated Under *Napue v. Illinois*.

A conviction obtained through false or misleading evidence is repugnant to the Constitution. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). This rule is fundamental to the criminal justice system as it guards against the peril of wrongful convictions and reinforces the notion that the Government is not an ordinary party to litigation whose object is to convict a defendant at all costs. *See Berger v. United States*, 295 U.S. 78, 88 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it

21

shall win a case, but that justice shall be done."); *Jenkins v. Artuz*, 294 F.3d 284, 296 n.2 (2d Cir. 2002) (noting the duty of prosecutors is "to seek justice, not merely to convict").

Importantly, the Government need not know that the evidence is false or inaccurate. It is enough that the Government "*should have known*" the testimony was false or that the Government "simply allowed [false] testimony to pass uncorrected." *United States v. Bartko*, 728 F.3d 327, 335 (4th Cir. 2013) (quoting *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994)); *see also United States v. Price*, 357 F. Supp. 2d 63, 69 (D.D.C. 2004) ("[A] defendant seeking a new trial must show that false testimony was presented at trial, and that the government knew, or *should have known*, that the testimony was false."(emphasis added)).

Nor must a defendant prove that a witness lied or committed perjury. As explained in *United States v. Freeman*, 650 F.3d 673, 679–80 (7th Cir. 2011):

> To uphold the granting of a new trial, there does not need to be conclusive proof that the testimony was false or that the witness could have been prosecuted for perjury; all that matters is that the district court finds that the [G]overnment has knowingly used false testimony. Thus, we reject the [G]overnment's argument that a claim under *Napue* can only be made when it can be established that the witness is lying.

*Id.* at 679–80; *see also Bartko*, 728 F.3d at 335 ("To obtain a new trial on the basis that [the witness] testified falsely, [the defendant] must demonstrate that [the witness] gave false testimony; he need not demonstrate that [the witness] committed perjury.").[4]

When a prosecutor introduces evidence he knows or should know to be inaccurate and misleading the verdict must be set aside unless there is no "reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 96 (1976); *see also Bartko*, 728 F.3d at 335 ("A new trial is required when the government's knowing use of false testimony could affect the judgment of the jury.") (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). Accordingly, under *Napue* and *Agurs*, a verdict must be set aside where "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (*en banc*) (internal quotation marks and alteration omitted).

---

[4] Factual inaccuracy is not even required. It is enough that the testimony creates a *false impression* of a material fact. *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967) ("[D]ue process is violated not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact."); *see also Bartko*, 728 F.3d at 335 ("[E]vidence may be false either because it is perjured, or, though not itself factually inaccurate, because it creates a false impression of facts which are known not to be true."); *Freeman*, 650 F.3d at 680 (stating that falsity includes "vague statements that could be true in a limited, literal sense but give a false impression to the jury").

1.     **The evidence regarding the Medicaid requirements to obtain respite care was false and misleading.**

a.     **There was no Medicaid live-at-home requirement during the period of the offense conduct.**

The Medicaid program in which the Perrys and CPC participated was the Virginia Medical Assistance Program ("VMAP"). It is administered by Virginia's Department of Medical Assistance Services ("DMAS"). DMAS is governed by Title 12 of the Virginia Administrative Code ("VAC"). Chapter 120 of Title 12 governs "waivered services," which are "a variety of home and community-based services paid for by DMAS as authorized under a [Social Security Act] § 1915(c) waiver designed to offer individuals an alternative to institutionalization." 12 Va. Admin. Code 30-120-700. Within Chapter 120, VAC 30-120-766 governs "Personal care and respite care services." *Id.* 30-120-766.

Before 2007, the DMAS respite care regulation stated, "[r]espite care may only be offered to recipients who have a primary unpaid caregiver living in the home who requires temporary relief to avoid institutionalization of the recipient." 12 Va. Admin. Code 30-120-768(B) (2001); 17 Va. Regs. Reg. p. 2613 (May 21, 2001). The pre-2007 regulations defined "Respite care" as "services provided to unpaid caretakers of eligible recipients . . . because of the absence of or need for relief of those persons residing with the recipient." *Id.* 30-120-700 (2001); 17 Va. Regs. Reg. p. 2599.

In July 2007, VAC 30-120-766 was amended to *remove* the requirement that a recipient's primary caregiver live in the home of the respite care recipient covered by

24

DMAS (and Medicaid). 12 Va. Admin. Code 30-120-766(B)(2) (2007); 23 Va. Regs. Reg. p. 3201 (June 11, 2007). And the "respite care" definition was also amended to remove the "residing with the recipient" requirement. *Id.* 30-120-700, 23 Va. Regs. Reg. p. 3181.

Beginning in July 2007,[5] and continuing through the current regulations, VAC 30-120-766 states that "[i]n order to qualify for respite care, individuals must have an unpaid primary caregiver who requires temporary relief to avoid institutionalization of the individual." 12 Va. Admin. Code 30-120-766(B)(2). And "Respite care" is defined as "services provided for unpaid caregivers of eligible individuals who are unable to care for themselves and are provided on an episodic or routine basis because of the absence of or need for relief of those unpaid persons who routinely provide the care." *Id.* 30-120-700.

In short, since July 2007, neither VAC 30-120-766 nor the regulatory definition of "respite care" required that the primary caregiver live in the home of the respite care recipient.

### b. No Medicaid regulation provides that only a primary caregiver can request respite care services.

To establish that Medicaid required primary caregivers to request respite care services, the Government offered sections from the Virginia Medicaid Provider Manual defining respite care as a service provided because of the absence of or need

---

[5] The 2007 amendments to 12 Va. Admin. Code 30-120-766 became effective on July 1, 2007. *See* 23 Va. Regs. Reg. p. 3174.

for relief of the primary caregiver. (JA 3207, 3217.) But the Manual nowhere states that only primary caregivers may *request* respite care services. VAC 30-120-766 also contains no such requirement.

The Government's evidence and representations to the jury in opening and closing that DMAS/Medicaid required (1) the primary caretaker to live in the recipient's home up to 2011 and (2) only primary caregivers, not patients, could request respite care, were entirely false.

### 2.     The Government should have known of the falsity of its claims.

The Government should have known that the live-in-the-home and primary-caregiver-request evidence was false. The Government had access to the historical versions of VAC § 30-120-766, all DMAS regulations, including the 2007 amendments and all versions in effect through the period of the scheme to defraud (2009 to 2013), and the Manual. Moreover, the Government relied on a Medicaid witness and an FBI special agent who specialized in health care investigations, each of whom should have known of the falsity, to testify as to the applicable DMAS/Medicaid regulations. Thus, because the Government should have known the testimony, evidence, and representations to the jury were false, the second *Napue* prong is satisfied. *Bartko*, 728 F.3d at 335.

### 3.     The false testimony could have affected the judgment of the jury.

During trial, the Medicaid live-at-home and primary-caregiver-request requirements were a focal point of the Government's case. In its opening, the

26

Government stated, "before July 1, 2011, a primary caregiver was required to live in the same residence as the patient. After July 1, 2011, living in the same residence was not required, but the person still had to be a primary caregiver." (JA 78.) The Government also added that "[t]he only person who can request respite care from a Medicaid provider like Community Personal Care is the primary caregiver. *Not the patient. . . . . Only the primary caregiver . . . .*" (JA 78–79.)

Without referencing any authority, Elliott testified that Medicaid regulations "required that the primary caregiver live in the same residence as the patient," (JA 125), and that only the primary caregiver can request respite care. (JA 122, 124.) Wright compounded the error and testified that it was "Medicaid's decision" that if the primary caregiver did not live with the patient, (JA 1447–48), and "there's not a caregiver that has ever requested respite, the hours billed are fraud." (JA 1450.) And the Government argued at closing that the Perrys' failure to comply with Medicaid's respite care requirements amounted to fraud. (JA 2661.)

The record makes clear that the false Medicaid evidence played a pivotal role in the Government's case to convict the Perrys of submitting false respite care claims. This is more than sufficient to establish the Perrys' *Napue* claim as to Counts 1, 2–5, and 10–13. To be clear, where the Government interjects false evidence into a trial, the threshold to establish that a jury verdict should be vacated is not high. *Napue* and *Agurs* require a "reasonable likelihood" that the jury "*could have*" been affected. Given the false testimony, evidence, and representations that the Government submitted to

the jury, there certainly is a "reasonable likelihood that the false testimony *could have affected the judgment of the jury.*" *Agurs*, 427 U.S. at 103 (emphasis added); *see also United States v. Parker*, ___ F.3d ___, 2015 WL 3895452, at *8 (4th Cir. June 25, 2015) (concluding that withheld impeachment evidence "would have had a reasonable probability of changing a single juror's view").

Due Process and fundamental interests of justice require a new trial where the Government introduced evidence (1) that was false, (2) that it should have known was false, and (3) that had any reasonable likelihood of affecting the jury's verdict. The record in this case establishes each of these requirements. The Perrys' convictions on Counts 1, 2–5, and 10–13 should be vacated.

**B.    The Perrys Convictions Should Be Vacated Because the Government Impermissibly Used the Purported Violations of a Civil Regulation to Supply a Critical Element of the Criminal Offense.**

The Perrys' convictions should be vacated because "it is impermissible to use the violation of a civil statute to *ipso facto* supply a crucial element of a criminal offense." *United States v. Eriksen*, 639 F.3d 1138, 1150 (9th Cir. 2011) (quotation marks omitted). The use of a civil statute is also impermissible where it "creates a serious risk that the jury may base a criminal conviction on civil violations." *United States v. Shetty*, 76 F. App'x 842, 845 (9th Cir. 2003) (internal quotation marks and citation omitted). Introducing proof of a civil regulatory violation "impermissibly infect[s] the very purpose for which the trial was being conducted" and may cause one to "question[]

28

whether [a defendant] was found guilty of" the crime or convicted on account of the civil violations. *United States v. Christo*, 614 F.2d 486, 492 (5th Cir. 1980). Therefore "[a] conviction resulting from the government's attempt to bootstrap . . . a civil regulatory violation . . . into a[] . . . felon[y], cannot be allowed to stand." *Id.*

Here, the (false) civil regulations regarding the pre-July 1, 2011 live-at-home and primary caregiver request requirements worked in tandem to supply a crucial element of the Government's respite care fraud and false claims case, and created a serious risk that the jury could base its convictions on Counts 2–5 (because the respite care charges provided an alternate, sufficient basis for conviction) and 10–13 (because the respite care charges provided the only basis for conviction) on the civil violations. The Government, through Elliott (its Medicaid witness), Wright, and its own statements, effectively told the jury that an entire category of CPC's respite care services from 2009 to 2011 necessarily was fraudulent *solely* by virtue of the Perrys' violations of the (false) Medicaid/DMAS regulations. For this same reason, the Government's use of the regulations also created a serious risk that the jury could base its convictions on Counts 2–5 (and therefore Count 1) and 10–13 on the civil respite care violations. At a minimum, the Government's focus on the civil respite care requirements could cause a reasonable observer to question whether the Perrys were found guilty of violating the civil regulation. *Christo*, 614 F.2d at 492.

That "evidence concerning a civil violation may be used to prove knowledge or intent," though "not . . . to prove criminal liability," does not cure the Government's

29

reliance on the false Medicaid requirements. *United States v. Hilliard*, 31 F.3d 1509, 1516 (10th Cir. 1994). This is so because where, as here, the jury was instructed on willful blindness, there is a "real possibility that the jury could have convicted [the defendant] for negligence in failing to heed the" civil regulation. *Id.* That danger is especially present in this case because the Government incorporated the Perrys' supposed violations of the (false) Medicaid/DMAS regulations as the primary theme of its respite care case. Indeed, Elliott and Wright offered testimony on the regulatory requirements, the Government called numerous witnesses to show the Perrys failed to satisfy these false requirements, and the Government relied heavily on the Perrys' violations of these false regulatory requirements throughout its opening statement and closing argument.

This Court's instruction to the jury that they could consider evidence relating to Medicaid/DMAS regulations and standards only for purposes of assessing the Perrys' "knowledge, intent and conduct," (JA 2797), cannot cure the grievous harm caused in this case. *United States v. Wolf*, 820 F.2d 1499, 1505 (9th Cir. 1987) (stating that "jury instructions, which described [the civil regulation] as background evidence, could not repair the damage caused by the indictment, testimony and argument"). This is so because the record shows the Government infected the trial with evidence of the Perrys' violations of (false) Medicaid/DMAS regulations to establish a critical element of the offenses charged in Counts 1, 2–5, and 10–13. This Court need look no further than Wright's testimony to sum up the Government's respite care case:

Q:     But for your purposes, there's no difference between a Vernice Spain, 80-hour, totally fraud respite time sheet and a two-hour respite care time sheet by a real personal care aid for a real client who was actually there working two hours. There's no difference, they're all fraud for you, right?

A.     If there's no caregiver that has ever requested respite, the hours billed are fraud.

Q:     And that's your decision?

A:     That's Medicaid's decision.

(JA 1450; *see also* JA 2662.) In other words, it is the violations of the (fictional) respite care regulations that establish the *mens rea* and *actus reus* elements of the charged crime. The Perrys' convictions must be vacated.

## II.   The Perrys Must Be Acquitted on Counts 9-13 and 15-18 Because the Government Failed to Prove They Knowingly Submitted the Specific False Claims Charged in the Indictment.

### A.     Reversal of the Conviction on Count 9 Is Required Because the Government Failed to Prove an that Objectively False Claim Was Submitted to Medicaid.

Count 9 alleged that Mr. and Mrs. Perry made a materially false statement in that, on or about January 14, 2011, they caused to be submitted to the Virginia Medicaid program a claim for payment that "falsely and fraudulently represented that Community Personal Care had provided personal care services" to patient EJ, "when in truth and in fact, as the defendants well knew," EJ "did not receive such personal care services." The alleged "dates of service" involved in the claim in Count 9 were January 3 to January 9, 2011.

31

The Government was thus required to prove beyond a reasonable doubt that the claim was false—that is, that CPC did not provide the personal care services for which it billed Medicaid for the week of January 3–9, 2011. *See United States v. Race*, 632 F.2d 1114, 1116 (4th Cir. 1980) (noting in false statements case that "the cornerstone of the stated offense is always the falsity of the statement"); *United States v. Barker*, 967 F.2d 1275, 1276 (9th Cir. 1991) ("For a claim to be false it must first be shown not to be in accord with the facts."); *cf. U.S. ex rel. Drakeford v. Tuomey*, ___ U.S. ___, 2015 WL 4036166, at *13 (4th Cir. July 2, 2015) (stating that to find a claim to be "false" under the False Claims Act, the statement alleged must represent an objective falsehood). In attempting to prove Count 9, the government principally relied on Government's Exhibit 23, a summary chart for EJ's CPC patient file, and the testimony of the FBI case agent. Exhibit 23 showed that, for the period of January 3, 2011, through January 9, 2011, CPC billed Medicaid for 42 personal care hours, but the personal care hours documented on the time sheets numbered 5, resulting in a supposed overcharge to Medicaid of $529.31. (JA 3363–71.) In her testimony Wright did not specifically discuss whether the 42 personal care hours billed for January 3-9, 2011, had in fact been provided. *Cf. Barker*, 967 F.2d at 1277 ("the government's only witness . . . explicitly conceded that he had no way of knowing whether the Barkers worked or not"). Nor did any other witness testify that there had been a weeklong gap in EJ's essential personal care.

Other than the missing timesheet, the Government offered no evidence on whether EJ's 42 personal care hours were, in fact, not provided, and then falsely billed to Medicaid by the Perrys for the week of January 3–9, 2011. Indeed, the remainder of the evidence tended to show that her regular personal care hours for the week in question were likely provided to EJ, and that there was never a complaint or suggestion that the hours had not been worked.

According to her long-time personal care aide, Mary McKay, EJ was not very capable of caring for herself; needed assistance; and needed care weekly. (JA 467, 473.) McKay did not testify that CPC failed to provide personal care hours to EJ on January 3–9, 2011.

Likewise, EJ's daughter, Wanda McNair, did not testify that CPC failed to provide personal care for her mother during the week in question, and further stated that she "would have known" if EJ's personal care aide had failed to show up for a week of personal care. (JA 840.)

These facts, even construed in the light most favorable to the Government, did not prove beyond a reasonable doubt that the claim in question in Count 9 was false. Indeed, there was not only a reasonable doubt; "there is total uncertainty as to what in fact is the truth," *Barker*, 967 F.2d at 1278, about whether CPC provided EJ's regular personal care hours in the first full week of January 2011. The Government conceded as much during trial, when it readily admitted that there had been "no evidence as to hours worked" as charged in the substantive counts, and that it was only required to

33

prove, not falsity, but that the billing did not match the supporting time sheets. (JA 1792, 1795.)

What the Government showed, at most, was that EJ's patient chart, seized from CPC in late 2012, did not contain a DMAS 90 time sheet for a particular week nearly two years earlier. But the absence of a single time sheet from a patient file cannot constitute proof of falsity beyond a reasonable doubt. This is particularly true because EJ's personal care was provided regularly and routinely by CPC over the course of several years, to someone who desperately needed daily care to survive. A timesheet can be lost, or misplaced, or thinned and separated from the file, or filled out incorrectly, or never filled out at all. But none of those events entails billing fraud.

In sum, no reasonable finder of fact could have concluded, merely from the circumstance of a missing DMAS 90 form, that the particular claim at issue in Count 9 was false beyond a reasonable doubt. Because the jury could not legitimately have concluded that the claim was false, this Court must reverse the Perrys' convictions on that count. *Barker*, 967 F.2d at 1277 (reversing false claims convictions where appellate court did not and could not know whether claim that defendants worked on a particular day was false).

**B.    Reversal is Required on Counts 10-13 and 15-18 Because the Medicaid Laws as Applied in this Case Were Unconstitutionally Vague.**

The Perrys are entitled to acquittal on Counts 10-13 and 15-18, all involving substantive claims for respite care services, because if the respite care services in

question were actually provided to patients, the Perrys could not have had the requisite intent to violate a regulatory regime so vague, debatable, and poorly understood.

The first prong of the Government's respite fraud theory was that, even if a CPC personal care aide in fact provided the respite hours to a Medicaid-approved patient, the Perrys nonetheless willfully defrauded the Virginia Medicaid program. This is because CPC aides worked respite hours for patients who were purportedly not eligible under the regulations to receive those hours. So, for example, under the Government's theory for EM, who was the patient in Counts 4 and 10, the *entire amount* that CPC received from Medicaid for respite care, $35,454.61, amounted to health care fraud, since EM's son and primary caregiver lived in Maryland and did not request respite care. According to the Government's theory, "[i]t doesn't matter if [the time] was worked" (JA 1448), so regardless of whether particular respite hours were actually requested and provided and even though Medicaid had authorized the respite hours, the Perrys were guilty of health care fraud because certain of CPC's clients were allegedly ineligible for respite care, either because their caregivers did not live in the patient's home, or because they did not personally request the care. *Cf. United States v. Catone*, 769 F.3d 866, 877 (4th Cir. 2014) (vacating felony sentence where government claimed that loss amount was the "entire amount of benefits" received even though defendant would have been entitled to some benefits had he truthfully reported income).

35

The flaw in the Government's respite theory was that the nuances of the Virginia Medicaid regulations, and the practices within the bureaucracy that administered them, were far too vague and insufficiently understood to be the predicate for a finding of specific criminal intent. It is settled that the Government is required to give "fair warning . . . in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle v. United States*, 283 U.S. 25, 27 (1931) (Holmes, J.); *see Johnson v. United States*, ___ S. Ct. ___, 2015 WL 2473450, at *4 (June 26, 2015) ("Our cases establish that the Government violates this [due process] guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement"). Thus, "where the law is vague or highly debatable, a defendant—actually or imputedly—lacks the requisite intent to violate it." *United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir. 1974). Further, "[c]riminal prosecution of an unclear duty itself violates the clear constitutional duty of the government to warn citizens whether particular conduct is legal or illegal." *United States v. Mallas*, 762 F.2d 361, 363 (4th Cir. 1985) (Wilkinson, J.). This is particularly true where the law requires a *mens rea* of "willfulness," since willful conduct is the voluntary and intentional violation of a known legal duty, so "the duty involved must be knowable." *See id.*

Analyzed carefully, the Government's respite fraud theory amounted to the following: (1) if the primary caregiver did not live in the patient's home in the period

36

prior to July 1, 2011, respite care provided within that period constituted health care fraud; and (2) if the patient, and not the primary caregiver, requested respite hours, the provision of those hours constituted fraud. These "bright lines" were the bedrock of the Government's respite fraud case.

But the Government's respite fraud theory discounted the law and ignored the evidence. The supervising nurses' detailed notes, not the Government's construction of the regulations, told the true story. The notes showed that in numerous nurse-patient relationships, respite care hours were an important part of the benefit the patient received, and neither the patient nor the nurse believed that there was anything wrong about providing respite hours at the patient's request. For example, Hanson's notes showed that respite hours had been approved for EJ in March 2010, when Hanson began to visit her. In July 2010, Hanson noted that EJ "continues to need personal care and respite care services." In August 2010, Hanson noted that E.J. "continues to need personal care and respite services; aide is wonderful and pleased with services." (JA 384.)

Hussein testified that she identified a primary caregiver in every CPC case; that she specifically encouraged the use of respite care, especially to clients who were sick or very ill; and that she found nothing wrong with encouraging clients to use respite hours. No one remotely suggested that Hussein was thereby perpetrating a fraud. Regarding patient EM, who received nearly the maximum amount of weekly personal care hours, Hussein communicated with her son, Michael Mullen; spoke to him about

37

respite care; and received calls in which EM would ask how many respite care hours remained. (JA 1742–75.) Hussein also discussed respite hours with EJ's daughter, McNair. (JA 1752.)

The evidence showed that CPC's nurses, their patients, and the Virginia Medicaid program itself applied the respite regulations broadly and liberally for eligible patients who requested the benefit, never thinking that they were committing fraud. Nevertheless, the Government advanced the strictest possible construction of the respite rules as the basis for "bright-line" (and utterly unprecedented) [6] fraud charges against the Perrys. In a regulatory regime this "loose," as Nurse Hanson aptly described it, a jury finding that the Perrys acted "willfully" in submitting claims for having furnished routine respite care services to CPC's patients was impermissible. *See Johnson*, 2015 WL 2473450, at *7 ("Invoking so shapeless a provision to condemn someone to prison" offends due process); *Mallas*, 762 F.2d at 365 ("without . . . fair warning, the government may not institute criminal proceedings").

### C.    There Was No Evidence That The Separate Offenses Committed by CPC Employees Constituted Conspiratorial Acts Under *Pinkerton*.

The Government's second, alternative, respite fraud theory was that the Perrys willfully and knowingly committed health care fraud when CPC employees

---

[6] Although respite care is ubiquitous, other than the instant prosecution counsel for Mr. Perry has been unable to find a single reported case, in any jurisdiction, in which a charge of civil or criminal fraud was lodged based on the provision of respite hours to patients whose primary caregiver did not live in the home and did not request the hours. This case is unique.

manufactured and billed for respite hours that were never worked, often using time sheets that were neither signed nor filed. But the evidence did not permit the jury to make that finding, because the government's own witnesses repeatedly admitted that their fabrication of respite hours was never directed by the Perrys, and that their self-dealing crimes were entirely their own. *See United States v. Rufai*, 732 F.3d 1175, 1192 (10th Cir. 2013) (reversing conviction for aiding and abetting health care fraud where there was "no direct evidence of Mr. Rufai's knowledge of the fraudulent scheme or of his intent to participate").

The evidence from a phalanx of immunized witnesses overwhelmingly established that (1) CPC staffing coordinators embezzled tens of thousands of dollars (the amount was never determined because the government refused to investigate the embezzlements) from CPC and Medicaid by fabricating and submitting false respite care time sheets; (2) the Perrys, who were often absent from the business in 2012 because a family member was terminally ill, never directed or approved the embezzlements, and indeed were victimized by them; (3) the staffing coordinators enlisted personal care aides to participate in their crimes and to secretly pay them cash kickbacks; (4) the staffing coordinators and the billing clerk kept fraudulent respite time sheets separate from legitimate ones, to hide them from the nurses and the Perrys; (5) Mr. Perry directed CPC employees to contact patients and invite them to request respite care—a direction which belied the existence of a conspiracy to fabricate respite time sheets out of thin air; (6) when Mr. Perry discovered that Spain,

39

Freeman, and Nichols were stealing, he terminated them and they left his employ with nary a word.

Thus, none of the known perpetrators in the respite care false billing, embezzlement, and kickbacks scheme testified that Mr. Perry was involved in or had knowledge of their crimes, which they had initiated and actively concealed from him and others at CPC. To convict the Perrys of the respite fraud crimes perpetrated by CPC's employees and charged in Counts 10-13 and 15-18, the Government was required to introduce "substantial" evidence that they caused and intended those crimes. *See Rosemond v. United States*, 134 S. Ct. 1240, 1248 (2014) ("[T]o aid and abet a crime, a defendant must not just 'in some sort associate himself with the venture,' but also 'participate in it as in something that he wishes to bring about' and 'seek by his action to make it succeed'" (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)). But there was no such evidence, and accordingly the jury was permitted to convict the Perrys of substantive fraud crimes in which they were not involved and which they did not intend. *See United States v. Hayes*, 574 F.3d 460, 477–78 (8th Cir. 2009) (reversing conviction for aiding and abetting another employee's false statement offense, even though defendant was supervisor and office manager and involved in separate conspiracy at health care agency, where there was no evidence that defendant knew that other employee was falsifying form or committed an affirmative act to further other employee's offense).

40

Finally, because the alleged substantive respite care offenses were not committed "in furtherance" of any conspiracy sufficiently shown to involve the Perrys, and "did not fall within the scope" of any such agreement, the Perrys could not be held vicariously liable for CPC employees' crimes. *See Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946).

In sum, the record fails to support either of the Government's alternative theories of the Perrys' guilt as to Counts 10–13 and 15–18. Regarding respite hours actually provided to CPC patients who were arguably ineligible, the Virginia Medicaid regulations were too vague and loosely administered to permit a novel finding of criminal intent based on a strict, "bright-line" construction of the regulations. As for fictitious respite hours recorded and billed for by scheming CPC employees, none testified that the Perrys knew about or were involved in their substantive crimes, or that the specific claims were acts in furtherance of a conspiracy that included the Perrys. *Cf. United States v. Aseracare, Inc.*, No. 2:12-cv-245, Dkt. 298, at 3 (N.D. Ala. May 20, 2015) ("Falsity cannot be inferred by reference to AseraCare's general corporate practices unrelated to specific patients. A claim is either false or not without evidence of corporate practices unrelated to that claim."). Accordingly, the Perrys are entitled to reversal of their convictions on Counts 9–13 and 15–18.

41

### III. The District Court Committed Plain Error in Instructing the Jury on the Definition of "Willfulness."

To obtain convictions for health care fraud under 18 U.S.C. § 1347(a) (Counts 2–5), and making false statements relating to health care matters, *see* 18 U.S.C. § 1035 (Counts 6–13), the Government was required to prove beyond a reasonable doubt that the. Perrys "knowingly and *willfully*" committed these crimes. To establish that a defendant "willfully" committed either offense, "'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" *Bryan v. United States*, 524 U.S. 184, 191–92 (1998) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)); *see also United States v. Iwuala*, ___ F.3d ___, 2015 WL 3609721, at *10 (1st Cir. 2015) (explaining in context of health care fraud case that "willfulness" means "an act . . . undertaken with a 'bad purpose,' that is, with knowledge that the act is unlawful."); *see also United States v. Franklin–El*, 555 F.3d 1115, 1122 (10th Cir. 2009) (explaining that to prove violation of § 1347(a) Government must prove defendant acted with knowledge that his conduct violated the law).

To be sure, the First and Ninth Circuits at one time took the position that the term "willfully" as used in § 1035 "simply means 'deliberately and with knowledge,' and does not require knowledge of unlawfulness." *United States v. Ajoku*, 718 F.3d 882, 889 (9th Cir. 2013); *United States v. Russell*, 728 F.3d 23, 32 (1st Cir. 2013) ("[W]e agree with the Ninth Circuit that an instruction on 'willfulness' does not necessarily require knowledge of illegality."). But on appeal to the Supreme Court, the Solicitor General

42

in both *Ajoku* and *Russell* confessed error and argued that a defendant "willfully" makes a false statement in violation of § 1035 where the evidence shows the defendant "acted with knowledge that his conduct was unlawful." *See* Br. of the United States in Opp'n to Petition for Cert. in *Ajoku v. United States*, 2014 WL 1571930, at *10 (U.S. Mar. 10, 2014); Br. of the United States in Opp'n to Petition for Cert. in *Russell v. United States*, 2014 WL 1571932, at *6 (U.S. Mar. 10, 2014) ("[T]he government now agrees that the correct interpretation of 'willfully' in Section 1035 is the one articulated in *Bryan v. United States*, 524 U.S. 184 (1998). To find that a defendant 'willfully' made a false statement in violation of Section 1035, a jury must conclude 'that he acted with knowledge that his conduct was unlawful.'"). In light of the Government's new position, the Supreme Court vacated both *Ajoku* and *Russell*. *Ajoku v. United States*, 134 S. Ct. 1872 (2014); *Russell v. United States*, 134 S. Ct. 1872 (2014); *cf. United States v. Hickman*, 331 F.3d 439, 444 (5th Cir. 2003) (concluding in case brought under § 1347 that district court committed no error where instructions omitted the word "willfully" but incorporated the concept that defendant intended to "defraud—trick or cheat—a health care benefits program out of . . . money or property").

Both the Government and the Perrys filed proposed instructions on the § 1347 and § 1035 counts that contained the "willfully" definition endorsed by the Supreme Court in *Bryan* and the Solicitor General in *Ajoku* and *Russell*. (JA 2710 ("'willfully' . . . means that the defendant committed the acts voluntarily and purposely, and with

43

knowledge that their conduct was, in a general sense, unlawful.")); (JA 4407) ("An act is done willfully if done . . . with knowledge that his conduct is unlawful.").) Nevertheless, the district court rejected the parties' proposed instructions and told the jury "[a] person acts 'willfully,' as that term is used in these instructions, when that person acts deliberately, voluntarily, and intentionally." (JA 2795.) This instruction was plainly erroneous.

The significance of the omission of this language from Instruction No. 28 cannot be understated. Instruction No. 26 defines the term "knowingly" as meaning that the defendants "were conscious and aware of their action . . . and did not act because of ignorance, mistake, or accident." (JA 2793.) Instruction No. 28 then defines "willfully" as acting "deliberately, voluntarily, and intentionally." (JA 2795.) Absent the qualifier that "willfully" also means that the defendant knows his conduct is unlawful, the terms "knowingly" and "willfully" have essentially the same meaning. As such, instructing the jury that "willfully" means nothing more than deliberate, voluntary, and intentional conduct deprived the term of independent effect. And the Supreme Court has cautioned against interpreting a criminal statute in a way that would "treat [] [a] 'willfulness' requirement essentially as surplusage." *Ratzlaf v. United States,* 510 U.S. 135, 140 (1994).

Under Instruction No. 28, the jury was expressly permitted to find the Perrys guilty of Counts 2–13 by concluding that their conduct was willful without also finding beyond a reasonable doubt that they knew such conduct was unlawful. When

44

an error involves the omission of an element of an offense from the jury charge, such an error constitutes reversible error even under plain error review, because "it would deprive the accused of his substantial right to an instruction that includes every element of the offense which must be proved by the government beyond a reasonable doubt." *United States v. McLamb,* 985 F.2d 1284, 1293 (4th Cir. 1993); *see also Elonis v. United States,* 135 S. Ct. 2001, 2012 (2005); *United States v. Polowichak*, 783 F.2d 410, 415–17 (4th Cir. 1986) (reversing convictions and ordering new trial where trial court failed to provide instruction as to every element of the crime regardless of whether a party requested an appropriate instruction).

In sum, where a district court has not properly instructed a jury on a necessary element of the charged crime, a court cannot conclude that the proceedings against the defendant resulted in a fair and reliable determination of guilt. *See United States v. Cedelle,* 89 F.3d 181, 186 (4th Cir. 1996). Here, the trial court provided the jury with an incorrect definition of "willfulness," a necessary element of the charged crime. This requires this Court to vacate the Perrys' convictions on Counts 2–13. *See Polowichak*, 783 F.2d at 415–17.

## IV.    This Court Should Vacate the Perrys' Convictions on Counts 15–18 Because The Aggravated Identity Theft Statute Does Not Reach the Offense Conduct Charged in this Case.

The federal "[a]ggravated identity theft" statute imposes a mandatory consecutive two year prison term upon individuals convicted of a short list of predicate crimes if, during (or in relation to) the commission of those other crimes,

45

the offender "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person." 18 U.S.C. § 1028A. Health care fraud, 18 U.S.C. §§ 1035 and 1347(a), fall among § 1028A's list of predicate crimes.

This Court should reverse the Perrys' aggravated identity theft convictions (Count 15–18) because they did not "use" a means of identification "without lawful authority" by submitting fraudulent Medicaid claims. Although this Court's precedent currently supports the legal basis for their convictions, *see United States v. Abdelshafi*, 592 F.3d 602 (4th Cir. 2010), that precedent is suspect in light of the Seventh Circuit's *en banc* decision in *United States v. Spears*, 729 F.3d 753 (7th Cir. 2013) (finding § 1028A applies only where person's identity has been stolen or misappropriated and there exists a victim other than the public at large), the Sixth Circuit's ruling in *United States v. Miller*, 734 F.3d 530 (6th Cir. 2013) (holding § 1028A applies only where defendant either passes himself off as that person or acts on behalf of that person), and recent Supreme Court precedent rejecting the approach to statutory interpretation used in *Abdelshafi*, which fails to view statutory text in light of context and purpose. *See*, *e.g.*, *King v. Burwell*, 135 S. Ct. ___, 2015 WL 2473448 (2015); *Yates v. United States*, 135 S. Ct. 1074 (2015). Moreover, application of § 1028A to cases where there is no evidence that (1) anyone's identity was misappropriated or (2) the "use" of identifying medical information caused harm to any person leads to extraordinary injustice.[7] Here, where

---

[7] Appellants are mindful that a prior panel decision of this Court can be overruled only by *en banc* review or an intervening Supreme Court decision. *Jones v. Angelone*, 94

the district court would otherwise have sentenced Mrs. Perry to just a single month in prison, and Mr. Perry's sentence would have otherwise been sharply reduced, the injustice is palpable.

1. **The phrase "without lawful authority" as used in § 1028A is ambiguous and should be read narrowly to conform to § 1028A's structure and purpose.**

Courts have recognized that § 1028A is rife with ambiguities. *See, e.g., Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009); *Miller*, 734 F.3d at 539; *Spears*, 729 F.3d at 756. This Court in *Abdelshafi*, however, found the phrase "without lawful authority" unambiguous and concluded it reaches any use of a patient's identifying information for an improper purpose. This is so even if the defendant obtained the patient's personal identification lawfully and did not use the identification to impersonate the patient or act on the patient's behalf. *See* 592 F.3d at 609.

*Abdelshafi*'s reading of the phrase may seem reasonable in isolation, but it is at war with the phrase's surrounding text, and broader textual meaning and purpose. As the Supreme Court has explained, "[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *see also Deal v. United States*,

---

F.3d 900, 905 (4th Cir. 1996). Still, Appellants challenge their § 1028A convictions here in light of decisions of the Supreme Court and other courts of appeals, and to preserve the issue for *en banc* or Supreme Court review. *See Snyder v. Phelps*, 580 F.3d 206, 216 (4th Cir. 2009) (explaining issue not raised in opening brief is considered waived).

508 U.S. 129, 132 (1993) (stating it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used").

Viewing the phrase within the context of the statute leads ineluctably to the conclusion that the phrase is subject to different interpretations. The first is a construction so broad that it includes any fraudulent conduct in which another person's identifying information is involved, even where the information is used merely to match a fraudulent bill to the account of a Medicaid beneficiary. The second is a narrow reading reaching the core offense of assuming the identity of another person without consent to obtain something of value in that person's name. The textual clues within the statute and its general purpose pull strongly towards the narrow reading. *See Yates*, 135 S. Ct. at 1087 (rejecting aggressive reading of term "tangible object" in light of examination of statutory context and purpose); *Miller*, 734 F.3d at 540–41.

Note first § 1028A's title: "Aggravated identity theft." That title in no way suggests that "without lawful authority" reaches conduct that does not involve misappropriating or assuming another's identity. And while the statute's heading is not commanding, it provides proof that Congress did not intend the statute to sweep within its ambit every unlawful act involving a document or other record that happens to contain identifying information of another person. *See Almendarez-Torres v. United States*, 523 U. S. 224, 234 (1998) ("[T]he title of a statute and the heading of a section

48

are tools available for the resolution of a doubt about the meaning of a statute." (internal quotation marks omitted)).

The surrounding text also supports a narrow application of the provision. The Government charged that the Perrys "used" without lawful authority patient information when they "submitted false claims to Medicaid for personal care and respite services." A person "uses" identifying information for purposes of § 1028A when he impersonates or passes himself off as another person, acts on the person's behalf, or obtains something of value in one of their names. *See Miller*, 734 F.3d at 541. It follows that to "use" a means of identification "without lawful authority" means to assume the identity of another without consent to commit one of the enumerated offenses.

The Perrys' aggravated identity theft convictions stem from allegations that they submitted claims to Medicaid containing fraudulent representations about the personal and respite care services provided to two Medicaid recipients: JG and DR (JA 59–62.) It is undisputed that these patients provided their Medicaid beneficiary numbers and information to CPC and authorized CPC to use this information to submit claims for payment of personal and respite care services. There was no proof that the Perrys or CPC "used" JG or DR's identifying information to impersonate or pass themselves off as JG or DR. It is also undisputed that the claims submitted by CPC truthfully represented that CPC was the party seeking payment from VMAP. And there is no dispute that the claim forms accurately represented JG and DR as the

49

Medicaid beneficiaries who received care. Thus, the only alleged "*use[s]* without lawful authority" were misrepresentations of the facts regarding the care provided to these patients. The Perrys' alleged acts of providing false statements regarding the care provided to patients is conceptually distinct from the Perrys passing themselves off as the patients or acting on the patients behalf during the commission of a serious federal offense.

### 2.    A conviction under § 1028A requires a showing of a real victim.

The term "theft" within § 1028A's caption has special significance. The term signifies taking something of value from another without their consent. This necessarily implies the existence of a *victim*.[8] Hence, the Solicitor General of the United States argued to the Supreme Court in *Flores-Figuera* that "[t]he statutory text makes clear that the *sine qua non* of a [§] 1028A(a)(1) offense is the presence of a *real victim*." Brief for the United States in *Flores-Figuera v. United States*, No. 08-108, at 20 (Jan. 2009) (emphasis added). The Solicitor General's brief in *Flores-Figuera* riffs on this theme throughout: "Section 1028A(a)(1)'s legislative history underscores Congress's emphasis on the victim," *id.*; "[t]he statistics recounted in the House Report about the prevalence of 'types of identity theft' (House Report 4) . . . focus on the harms suffered by those whose identities are misappropriated," *id.*, "[s]ection 1028A(a)(1)'s overriding purpose is . . . protect[ing] the good credit and reputation of

---

[8] The "public at large" or the Government is not a real victim for purposes of § 1028A. *See Spears*, 729 F.3d at 757.

50

*CONFIDENTIAL MATERIAL REDACTED*

hardworking Americans," *id.* at 21; *see also Spears*, 729 F.3d at 757 ("The usual victim of identity theft may be out of pocket (if the thief uses information to buy from merchants) or may be put to task of rehabilitating a damaged reputation."); *Flores-Figueroa*, 556 U.S. at 655 (observing that the examples in the legislative history of § 1028A involve people injured when a third party used their names or financial information (credit card or Social Security numbers) without consent). That § 1028A is a victim-focused statute supports the conclusion that the phrase "use without lawful authority" does not reach conduct where a person lawfully obtained a patient's identifying information, accurately represented to third-parties that the information belonged to that patient, and made no attempt to obtain anything of value at the patient's expense.

Rather than victims,

CONFIDENTIAL MATERIAL REDACTED



Thus, the core element of a § 1028A crime (a "real victim") was wholly absent from this case. *See* Brief for the United States in *Flores-Figuera v. United States*, at 20 ("[T]he *sine qua non* of a Section 1028A(a)(1) offense is the presence of a *real victim*.).



The clear lack of a real victim in this case should compel this Court to revisit its prior interpretation of § 1028A and adopt a construction tailored to § 1028A's focus of vindicating the rights of identity theft victims. *Cf. Burwell*, 2015 WL 2473448, at *15 (explaining that statute should be read in light of "context and structure" and consistent with aims of the legislation).

### 3.    The rule of lenity requires that the Perrys' conviction be reversed.

When facing two reasonable interpretations of statutory language, courts must apply the rule of lenity. Under this rule, when ambiguity clouds the meaning of a criminal statute, "the tie must go to the defendant." *United States v. Santos*, 553 U.S.

507, 514 (2008) (plurality); *see also United States v. Bass*, 404 U.S. 336, 348 (1971) (explaining that the rule of lenity requires "where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant.").

Reasonable minds may disagree over the meaning of the phrase "without lawful authority" when read alongside its neighboring verb "use," and the broader context of the statute's structure and purpose. This requires application of the rule of lenity and reversal of the Perrys' convictions under § 1028A.

## V.  The Evidence Was Insufficient as a Matter of Law to Support Angela Perry's Convictions on Counts 2–13 and 15–18.

Additionally, Angela Perry was a named Defendant in all substantive counts (Counts 2–13 and 15–18). Common to each count was a specific, identifiable Medicaid Recipient, identified by initials, whose file was the specific subject of the particular count under consideration on a specific alleged date.

Mrs. Perry respectfully submits, however, that the record is absolutely devoid of any specific evidence connecting or tying her specifically to the offense conduct as to the specific, identifiable file in each count of conviction on each of the alleged dates of the offense conduct.

While there was testimony in a general sense that Mrs. Perry was aware of Mr. Perry's general activities regarding fraudulent billing, not a single witness or document identified Mrs. Perry as having been specifically involved with any of the specifically identified files under any of the counts on the occasions in question.

53

Otherwise stated, the evidence left the jury to speculate as to whether in fact Mrs. Perry had anything whatsoever to do with any of the specifically identified files on the dates in question under each of the counts in question.

In this regard, Mrs. Perry respectfully submits that the Government, in its Brief in Opposition, will be unable to point to any evidence that in any way ties or connects her to any of the specifically identifiable files on the dates described in Counts 2–13 and 15–18.

Because there is no evidence upon which a jury could have reasonably found that Mrs. Perry committed any of the specific offenses in Counts 2–13 and 15–18 of the Indictment, Mrs. Perry respectfully submits that her conviction on those Counts must be reversed.

## CONCLUSION

For all the reasons stated above, this Court should vacate the Perrys' convictions.

## REQUEST FOR ORAL ARGUMENT

The Appellants respectfully request oral argument. This case presents complex legal and factual issues, and argument will assist in the decisional process.

Respectfully submitted


By: /s/ Joseph R. Pope


John S. Davis
Joseph R. Pope
WILLIAMS MULLEN
A Professional Corporation
Williams Mullen Center
200 S. 10th Street
P.O. Box 1320
Richmond, VA 23218-1320
Tel.: (804) 420-6560
Fax: (804) 420-6507
jpope@williamsmullen.com
*Counsel for Appellant W. Wayne Perry*


Andrew Michael Sacks
Sacks & Sacks
150 Boush St
Suite 501
Norfolk, VA 23510-3874
Tel: (757) 623-2753
andrewsacks@lawfirmofsacksandsacks.com
*Counsel for Appellant Angela Perry*

**CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND LENGTH LIMITATIONS**

TO BE INCLUDED IMMEDIATELY BEFORE THE CERTIFICATE OF SERVICE FOR ALL BRIEFS FILED IN THIS COURT.

1.      This Brief has been prepared using (SELECT AND COMPLETE ONLY ONE):

   X        Fourteen point, proportionally spaced, serif typeface (such as CG Times or Times New Roman, NOT sans serif typeface such as Arial).  Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, CG Times, 14 point):

            <u>Microsoft Word 2010</u>

   ☐        Twelve point, monospaced typeface (Such as Courier or Courier New). Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, Courier, 12 point):

            _____

2.      EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statues, rules, or regulations; any certificate of service, the brief contains (SELECT AND COMPLETE ONLY ONE):

   ☐        _____ Pages (give specific number of pages; may not exceed 30 pages for opening or answering brief or 15 pages for reply brief); OR

   X        <u>13,631</u>   Words (give specific number of words; may not exceed 14,000    words or answering brief or 7,000 for reply brief);

            _____ Lines of Monospaced Type (give specific number of lines; may not exceed 1,300 lines for opening or answering brief or 650 for reply brief; may be used ONLY for briefs prepared in monospaced type such as Courier or Courier New).

I understand that a material misrepresentation can result in the Court's striking of the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

                              <u>/s/ Joseph R. Pope</u>

                              Signature of Filing Party

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of July 2015, I shall electronically file the foregoing with through the Court's CM/ECF system. All counsel of record shall be served through this Court's CM/ECF system.

<u>/s/ Joseph R. Pope</u>